689 F.2d 1137
 1982-2 Trade Cases 64,904
 In re ARTHUR TREACHER'S FRANCHISEE LITIGATION.
ARTHUR TREACHER'S FISH & CHIPS, INC.
v.
A & B MANAGEMENT CORPORATION
v.
MRS. PAUL'S KITCHENS, INC.
(Additional Defendant on the Counterclaims)
Appeal of A & B MANAGEMENT CORPORATION.
In re ARTHUR TREACHER'S FRANCHISEE LITIGATION.
ARTHUR TREACHER'S FISH & CHIPS, INC.
v.
A & B MANAGEMENT CORPORATION
v.
MRS. PAUL'S KITCHENS, INC.
(Additional Defendant on the Counterclaims)
Appeal of ARTHUR TREACHER'S FISH & CHIPS, INC., Plaintiff
and Mrs. Paul's Kitchens, Inc., Third Party Defendant.
 Nos. 81-2306, 81-2562.
 MDL No. 467.
 United States Court of Appeals,
Third Circuit.
 Argued March 18, 1982.
Decided June 18, 1982.
 
 Franklin Poul, Judith R. Cohn (argued), Barry M. Klayman, Brian P. Flaherty, Wolf, Block, Schorr & Solis-Cohen, Philadelphia, Pa., for appellant-cross-appellee A & B Management Corp.; Wolf, Block, Schorr & Solis-Cohen, Philadelphia, Pa., Weil, Gotshal & Manges, New York City, of counsel.
 John M. Elliott (argued), Edward F. Mannino, John F. Stoviak, Karen Marek McAlinn, Henry F. Siedzikowski, Edward S. Wardell, Dilworth, Paxson, Kalish & Levy, Philadelphia, Pa., for appellees-cross-appellants Arthur Treacher's Fish & Chips, Inc. and Mrs. Paul's Inc.; Dilworth, Paxson, Kalish & Levy, William C. Fields, III, Philadelphia, Pa., of counsel.
 Before ALDISERT, VAN DUSEN and GARTH, Circuit Judges.
 OPINION OF THE COURT
 GARTH, Circuit Judge.
 
 
 1
 This appeal presents the question whether the district court erred in awarding Arthur Treacher's Fish & Chips, Inc. (Arthur Treacher's) past and future royalties on its motion for a preliminary injunction against its franchisee, A & B Management Corp. (A&B).
 
 I.
 
 2
 A&B was incorporated in 1974 for the purpose of operating an Arthur Treacher's franchise. On November 22, 1974 A&B signed a Master License Contract with Arthur Treacher's giving it the right to operate Arthur Treacher's restaurants in the City and County of Philadelphia (A. 284a, 463a). On November 21, 1979, Arthur Treacher's was acquired by Mrs. Paul's Kitchen's, Inc. ("Mrs. Paul's"). Pursuant to the franchise agreement, A&B opened seven restaurants in Philadelphia, the last one being opened in May, 1980, with the approval of Mrs. Paul's.
 
 
 3
 A&B signed a Standard Unit License Contract for each of its restaurants, obligating A&B to pay royalties equal to the greater of $500 or 5% of the monthly gross receipts (A. 2867b, 2877b, 2886b). (The royalty rate was subsequently reduced to 4% in March, 1979 by an agreement between the parties (A. 473b-474b)). The contracts also imposed bilateral obligations on both A&B and Arthur Treacher's designed to insure the integrity of the Arthur Treacher's image and to promote good will. Thus, the agreements recognized that a franchising system required cooperation between the franchisor and its franchisees in promoting good will through systemwide use of high quality and uniform products and processes (A. 468).
 
 
 4
 In furtherance of these objectives, the Master Agreement and the Standard Unit Licenses required A&B to conform to Arthur Treacher's specifications with respect to products, containers, uniforms, supplies and equipment (A. 2858b, 2867b-68b). In turn, Arthur Treacher's obligated itself to provide services including assistance in opening new restaurants; real estate site selection; training courses; product development and improvement; review of products, equipment, and supplies used by franchisees; field inspections; protection of trademarks; coordination of advertising efforts; and management assistance (A. 468a-69a; A. 2856b-62b; 2867b-71b). In addition to services specifically enumerated in the contract, Arthur Treacher's had traditionally provided additional quality assurance and marketing services, including advertising services, designed to promote the franchisees system (A. 469a; 641b-42b; 1398b).
 
 
 5
 Arthur Treacher's continued to provide these services until sometime after 1977. To do so, it had a staff of 200-250 persons. Arthur Treacher's itself had an advertising budget of approximately $3,500,000 per year (A. 641b-42b). During this time period A&B, was recognized as an outstanding franchisee by the management of Arthur Treacher's (A. 466a).
 
 
 6
 Starting in 1978, the level of services provided by Arthur Treacher's steadily declined (A. 470a; 642b-48b; 1004b-2010b; 2613b-1615b). As a result of the cutback in services, and the perception that Arthur Treacher's no longer cared about the franchise system, many franchisees ceased paying royalties (A. 470a). In September of 1979, A&B discontinued its royalty payments in response to the deteriorating condition of the Arthur Treacher's franchise system.
 
 
 7
 On November 21, 1979 Mrs. Paul's, a company engaged in the business of manufacturing and selling frozen fish products, purchased Arthur Treacher's from its prior owner Orange Company (A. 467a). At the time of the purchase of Arthur Treacher's, the management of Mrs. Paul's knew that Arthur Treacher's books showed $5 million in uncollected royalties.[1]
 
 
 8
 According to A&B, after Mrs. Paul's purchased Arthur Treacher's, the services provided to franchisees diminished further. A&B claimed that quality assurance, advertising, field representative and other services were reduced or eliminated by Mrs. Paul's. Brief for Appellants at 11-12. Arthur Treacher's disputed these claims, and asserted that it provided services in full compliance with the franchise agreements, even though the franchisees were not paying royalties. Brief for Appellee at 14.
 
 
 9
 In addition to the failure to provide services to franchisees, A&B charged that Mrs. Paul's sought to use the franchise system for its own benefit and took steps that were contrary to the interests of the franchisees. A&B charged that after the takeover, Mrs. Paul's terminated Arthur Treacher's suppliers of Icelandic cod, and the franchisees were forced to buy inferior fish products. Furthermore, the new supplier of fish was unable to provide the quantities of fish needed by the franchisees (A. 471a). A&B claims, and the district court found, that in cutting off the suppliers of Icelandic cod, Mrs. Paul's was pursuing a scheme to compel the franchisees to buy their fish from Mrs. Paul's (A. 472).
 
 
 10
 On July 11, 1980 Arthur Treacher's sent a letter to A&B demanding payment of past due royalties (A. 465a). A&B did not pay the amounts claimed. On August 15, 1980, A&B was notified of its termination as an Arthur Treacher's franchisee and was instructed to remove all Arthur Treacher's trademarks, trade names and identifying characteristics from its premises. (A. 465a). On August 27, 1980 Arthur Treacher's commenced this litigation. (A. 466).
 
 A.
 
 11
 In its four-count complaint Arthur Treacher's charged A&B with infringement of Arthur Treacher's trademarks in violation of the Lanham Trade-Mark Act, 15 U.S.C. § 1121; unfair competition in violation of the Lanham Act, trademark infringement in violation of Pennsylvania law, 73 P.S. § 23, and breach of the franchising contracts (A. 8a-14a). The Complaint sought a judgment,
 
 
 12
 (1) enjoining Defendant A&B, and all of its officers, employees and agents from any further infringement of the Arthur Treacher's trademarks; (2) ordering A&B to immediately remove all Arthur Treacher's signs and other identifying characteristics from its stores, any goods, materials or products in its possession, custody and control; (3) awarding plaintiff damages caused by A& B's infringement of its trademarks; (4) granting plaintiff attorneys' fees and costs of suit....
 
 
 13
 (A. 11a, 12a, 13a-14a).
 
 
 14
 A&B responded by filing an answer and counterclaim against Arthur Treacher's and Mrs. Paul's. A&B alleged inter alia, the wrongful termination of A&B as a franchisee; various contractual breaches, including the failure to provide required franchisee services; and violations of the antitrust laws through tying arrangements and the acquisition of Arthur Treacher's by Mrs. Paul's (A. 22a-61a).[2] Arthur Treacher's then filed a motion for a preliminary injunction. It sought an order which would require A&B to "immediately remove all Arthur Treacher's signs and other identifying characteristics from its stores, and any goods, materials or products in its possession, custody or control; and restraining and enjoining A&B from infringing on plaintiff's trademarks in the future." (A. 16).[3] Significantly, there was no indication in the motion, or in the memorandum filed in support of the motion, that Arthur Treacher's sought an order compelling A&B to pay back royalties at this preliminary stage of the proceedings.
 
 B.
 
 15
 On July 30, 1981 after twelve days of hearings, the district court ruled on Arthur Treacher's motion. Although the court denied the relief sought by Arthur Treacher's in its motion, the district court concluded that "the real relief plaintiff seeks is the payment of these (past and future) royalties", (A. 478) and, thus, entered an order which among other provisions, decreed that:
 
 
 16
 Defendant, A&B Management Corporation shall, within twenty (20) days of the date of this Order, pay all past due royalties to plaintiff computed on the basis of four (4%) of defendant's monthly gross receipts. Defendant shall continue to pay royalties to plaintiff pending the litigation of this case.[4]
 
 
 17
 The key to the district court's decision to award such relief was its view of the comparative hardships faced by the parties. Even though Arthur Treacher's had never sought a preliminary injunction which would require A&B to pay $200,000 in past due and current royalties before trial, the district court nevertheless concluded that Arthur Treacher's would be irreparably harmed without such relief. The predicate for this conclusion was the court's findings respecting Arthur Treacher's financial health:
 
 
 18
 All parties agree that the royalties are the "lifeblood" of a franchise system. Without these royalties, Arthur Treacher's cannot exist. It has been represented to the court that the company is on the verge of bankruptcy.... The Court finds that continued non-payment of royalties pending litigation will inescapably result in the destruction of Arthur Treacher's and this without more, warrants a finding of irreparable harm pendente lite absent the mandatory injunction. If Arthur Treacher's ultimately prevails at trial, any award of money damages could hardly compensate it if it is bankrupt and without a franchise system which took years to develop.
 
 
 19
 (A. 485a).
 
 
 20
 In contrast, the district court found that A&B would suffer little if any harm if A&B was required to immediately pay $200,000 in back royalties (A. 485a). Further, the district court expressly declined to find that Arthur Treacher's was likely to succeed on the merits (A. 486-87a).
 
 C.
 
 21
 A&B moved for reconsideration of the July 30, order. It asserted the following grounds in support of its motion. (1) A&B could not pay the $200,000 in 20 days, without crippling its business; (2) the findings relating to Arthur Treacher's financial plight were unsupported by the record; (3) the district court's order imposed irreparable harm on A&B by forcing immediate payment of a disputed sum to a party who may not be able to repay it after a trial; (4) the preliminary injunction failed to recognize Arthur Treacher's obligation to provide franchisee services; (5) A&B should have been permitted the option to acquiesce in Arthur Treacher's termination of its franchisee as an alternative to its being obliged to pay the past royalties; (6) an injunction requiring payment of future royalties would have been sufficient to guarantee Arthur Treacher's continued existence pending trial (A. 488a-489a).
 
 
 22
 A&B's motion was denied on August 18, 1981.[5] (A. 516a, 517a-521a).
 
 
 23
 On August 19, 1981, A&B filed a notice of appeal from the July 30, and August 18, 1981 orders of the district court granting preliminary relief to Arthur Treacher's and denying A&B's motion for reconsideration. On that same day, A&B filed a motion for stay pending appeal in this Court (A. 522a). We granted A& B's motion for a stay on August 20, 1981 on the condition:
 
 
 24
 1. that A&B Management Corporation shall advise plaintiff in writing within 24 hours from the date of this order either:
 
 
 25
 (a) that it will immediately commence payment of future royalties as they come due or
 
 
 26
 (b) that it will forthwith remove all Arthur Treacher's signs and other identifying characteristics from its stores, and any goods, materials or products in its possession, custody or control, and 2. that if A&B Management Corporation elects (1)(a) it will within 3 business days from the date of this order post a bond with corporate surety in the sum of $100,000 to secure plaintiff in the event it is ultimately successful in its claim to unpaid back royalties.
 
 
 27
 On August 21, 1981, A&B advised Arthur Treacher's and Mrs. Paul's that it would comply with condition (1)(b) of the stay order.[6] A&B thus concluded its relationship with Arthur Treacher's.
 
 D.
 
 28
 On this appeal, A&B asserts that since it is no longer an Arthur Treacher's franchisee, and has not been one since August 21, 1982, that portion of the district court's order requiring it to pay current royalties pendente lite is no longer applicable. As to the portion of the order requiring the payment of $200,000 in back royalties, A&B claims that where the facts are in dispute and where monetary relief has not been requested by the movant, a court may not award damages by an injunctive order prior to final judgment.
 
 II.
 
 29
 This court's stay order of August 20, 1981 gave A&B the option of either commencing payment of future royalties or of terminating its relationship as an Arthur Treacher's franchisee. A&B chose the second option, and since August 21 it has operated as a fast food restaurant business unaffiliated with Arthur Treacher's. Thus, on this appeal, we are confronted with a far different factual configuration than that which the district court faced when it issued the July 30 preliminary injunction. At that time, A&B was an Arthur Treacher's franchisee and was vigorously fighting an effort by Arthur Treacher's to terminate its franchise. Now A&B has voluntarily severed its relationship with Arthur Treacher's, in effect giving the franchisor all the relief it sought on its motion for a preliminary injunction.
 
 
 30
 Accordingly, while we recognize that in normal course we view the record and district court proceedings as of the time when the district court's order is entered (here the preliminary injunction issued on July 30, 1981), in this case, because of the nature of the particular relief afforded-payment of future royalties-it is apparent that we cannot ignore the events that have transpired since the date of the preliminary injunction.
 
 
 31
 We are satisfied that this changed status moots the issue of the district court's order requiring payment of ongoing royalties. Since A&B is no longer an Arthur Treacher's franchisee using Arthur Treacher's trademarks, it should no longer be required to pay royalties. Thus, so much of the district court's order which required A&B to make royalty payments as they come due, must necessarily be vacated.[7]
 
 III.
 
 32
 Having held that so much of the district court's order of July 30, 1981 as required payment of future royalties must be vacated, we are left on this appeal with only the following operative provision of the July 30 order.[8]
 
 
 33
 Defendant, A&B Management Corporation shall, within twenty (20) days of the date of this Order, pay all past due royalties to plaintiff computed on the basis of four (4%) of defendant's monthly gross receipts.
 
 
 34
 This remaining provision, which requires the payment of past royalties by A&B, must be tested against the accepted established standard for the granting of a preliminary injunction by the district court.
 
 
 35
 We have repeatedly held that for the district court to grant a preliminary injunction:
 
 
 36
 the moving party must generally show (1) a reasonable probability of eventual success in the litigation and (2) that the movant will be irreparably injured pendente lite if relief is not granted. Moreover, while the burden rests upon the moving party to make these two requisite showings, the district court "should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest."
 
 
 37
 Oburn v. Shapp, 521 F.2d 142, 147 (3d Cir. 1975) (citations omitted). Accord, Continental Group, Inc. v. Amoco Chem. Corp., 614 F.2d 351, 356-57 (3d Cir. 1980); Delaware River Port Authority v. Transamerican Trailer Transport, Inc., 501 F.2d 917, 919-920 (3d Cir. 1974); Fitzgerald v. Mountain Laurel Racing, Inc., 607 F.2d 589, 600-601 (3d Cir. 1979), cert. denied, 446 U.S. 956, 100 S.Ct. 2927, 64 L.Ed.2d 814 (1980); Constructors Ass'n. of Western Pennsylvania v. Kreps, 573 F.2d 811, 815 (3d Cir. 1978). Unless both a "reasonable probability of eventual success" and "irreparable harm" are demonstrated, preliminary injunctive relief is not to be granted. Kershner v. Mazurkiewicz, 670 F.2d 440, 443 (3d Cir. 1982) (en banc). Thus, a failure by the moving party to satisfy these prerequisites: that is, a failure to show a likelihood of success or a failure to demonstrate irreparable injury, must necessarily result in the denial of a preliminary injunction.
 
 
 38
 In turn, our review of a district court's grant of a preliminary injunction is narrow. "Unless the trial court abused its discretion or committed error in applying the law, we must take the judgment of the trial court as presumptively correct." Kershner, 670 F.2d at 443. Accordingly, we cannot sustain a preliminary injunction ordered by the district court where either or both of these prerequisites are absent.
 
 
 39
 Apart from any consideration as to whether the district court here abused its discretion in awarding disputed past due royalties in a preliminary injunctive proceeding where the movant itself had not sought that relief, our independent examination of the record reveals that Arthur Treacher's has satisfied neither of the prerequisites essential to the issuance of a preliminary injunction.
 
 A.
 
 40
 Preliminarily, however, we address the question of whether the district court may award damages at a preliminary stage of the proceeding and prior to factfinding and final judgment. We know of no authority, and Arthur Treacher's has directed us to none, which would permit such an award.[9] Indeed, those cases which expressly address this subject, hold to the contrary.
 
 
 41
 In Schlosser v. Commonwealth Edison Company, 250 F.2d 478 (7th Cir. 1958), cert. denied, 357 U.S. 906, 78 S.Ct. 1150, 2 L.Ed.2d 1156 (1958), a retired employee of a company sought to recover monies which he claimed were due and owing to him under a service annuity plan which was in effect at the time of his retirement. After Schlosser's complaint had been filed, he moved for a preliminary injunction to compel the Company to pay him those monies which he claimed had been unlawfully denied to him, claiming that he would suffer irreparable harm unless a preliminary order was entered which would require the Company to pay him a service annuity of not less than $137.77 a month for the period specified in the complaint. The preliminary injunction was denied by the district court. The Seventh Circuit affirmed the denial of the preliminary injunction and stated:
 
 
 42
 It is indeed a novel theory that in an action for the recovery of damages the right to which is controverted by defendant, a preliminary injunction should issue to require a defendant to make payments in advance of a determination of the case on its merits. Plaintiff attempts to escape this dilemma by arguing that defendant's service annuity plan contemplates payments to a retired employee during his lifetime, and that a failure to so pay constitutes irreparable damages because the former employee might die before his rights were determined on the merits. The argument, if accepted, could be utilized in every action brought for the recovery of damages or a money award.
 
 
 43
 250 F.2d at 480-81 (emphasis added).
 
 
 44
 In our view, the short answer to Arthur Treacher's argument was provided some sixty years ago by Judge Learned Hand, at that time a member of the District Court for the Southern District of New York. Denying a motion for preliminary injunction which sought, among other things, money damages, he wrote:The relief demanded is of two kinds: First, for the money seized; second, for the books. As to the money, how is it possible to sue in equity? The acts charged constitute, on the plaintiffs' theory, a conversion, nothing more. Under the guise of a mandatory injunction I do not see how I can give final relief in advance of answer and trial in such a case. It is, of course, true that equity will at times affirmatively restore the status quo ante pending the suit. But never, so far as I know, will it take jurisdiction over a legal claim merely to hurry it along by granting final relief at the outset of the cause. The acts of the defendants may indeed be totally without justification-on that I express no opinion-but there is no reason why the plaintiffs should enjoy remedies not open to others who have suffered similar wrongs. I cannot suppose that it would anywhere be seriously contended that upon a conversion of money the victim might file a bill in equity and get final relief by mandatory injunction.
 
 
 45
 Sims v. Stuart, 291 F. 707, 707-08 (S.D.N.Y.1922) (citations omitted).
 
 
 46
 In essence the district court's order here sought to accomplish precisely that which was proscribed by the Schlosser and Sims court. The district court here ordered A&B to pay all past due royalties to Arthur Treacher's despite the fact that A&B had strongly contested any liability under the franchise agreement and has consistently maintained this position since the very outset of the litigation.
 
 
 47
 We have always understood that contested issues of fact, such as the questions here of which party breached the agreement, and what damages arose therefrom, must be resolved by a plenary evidentiary hearing in which the fact finder would determine liability and damages but only after the evidence had closed. Indeed, in its opinion, even the district court acknowledged that "both sides present viable claims the adjudication of which must await a full dress trial." (A. 486a). Yet in spite of this circumstance, the district court ordered A&B to pay the monies in issue-even though the liability and extent of such damages could not be adjudicated at this preliminary stage of the proceedings.[10]
 
 
 48
 We are satisfied that a preliminary injunction which ordered the payment of monies where the underlying contract is disputed, misconceives the equitable nature and purpose of an injunctive proceeding. By ordering A&B to pay past royalties, the district court granted Arthur Treacher's virtually all of the damages that it sought in its complaint and did so at a preliminary stage when no final adjudication was possible. In so doing, the district court erred.
 
 B.
 
 49
 While we recognize that "the traditional function of equity has been to arrive at a 'nice adjustment and reconciliation' between (...) competing claims;" Weinberger v. Romero-Barcelo, --- U.S. ----, ----, 102 S.Ct. 1798, 1803, 72 L.Ed.2d 91 (1982), we have never upheld an injunction where the claimed injury constituted a loss of money, a loss capable of recoupment in a proper action at law. See, e.g. Glasco v. Hills, 558 F.2d 179 (3d Cir. 1977); A. O. Smith Corp. v. F.T.C., 530 F.2d 515 (3d Cir. 1976).
 
 
 50
 In Glasco, tenants of an apartment complex whose mortgage was insured by the Department of Housing and Urban Development ("HUD") sought to prevent rent increases required by the owner and approved by HUD. The district court denied the tenants' motion for a preliminary injunction against the rent increases. This court affirmed the denial of injunctive relief, on the ground that no showing of irreparable injury had been demonstrated. Judge Aldisert, writing for the court, discussed the character of irreparable injury. He wrote:
 
 
 51
 We have said that the requisite feared injury or harm must be irreparable-not merely serious or substantial. " 'The word means that which cannot be repaired, retrieved, put down again, atoned for ... Grass that is cut down cannot be made to grow again; but the injury can be adequately atoned for in money. The result of the cases fixes this to be the rule: the injury must be of a peculiar nature, so that compensation in money cannot atone for it ....' Gause v. Perkins, 3 Jones Eq. 177, 69 Am.Dec. 728 (1857). 'Irreparable injury is suffered where monetary damages are difficult to ascertain or are inadequate.' Danielson v. Local 275, Laborers Union, 479 F.2d 1033, 1037 (2d Cir. 1973)." A. O. Smith, supra, 530 F.2d at 525.
 
 
 52
 It was a necessary prerequisite for a preliminary injunction that the tenants show irreparable injury. No probative evidence supporting this sine qua non was adduced before the district court prior to the orders of February and April, 1976, the subject matter of this appeal. At best, the claimed injury was financial, a loss of money, a loss capable of recoupment in a proper action at law.
 
 
 53
 558 F.2d 181-182. Here, the monetary damages which Arthur Treacher's claims to have suffered are capable of ascertainment and an award at final judgment will fully compensate Arthur Treacher's for its losses.
 
 
 54
 Moreover, we are not persuaded by Arthur Treacher's argument that unless the preliminary injunction is upheld, Arthur Treacher's faces an imminent threat of bankruptcy, which it contends constitutes irreparable injury. Arthur Treacher's never claimed, and the district court never found, that the survival of Arthur Treacher's, a company with net assets of approximately $9,000,000, depended solely on the immediate payment of the $200,000 allegedly owed by A& B. Thus, Arthur Treacher's argues that the threat of bankruptcy stems from the total liability of all franchisees that have withheld royalties. Yet, those franchisees are not parties to this action, and therefore the argument predicated on a withholding of royalties by all franchisees is not before us.[11] Moreover, the record which consists principally of general statements pertaining to the refusal of all franchisees to pay royalties is insufficient in any event to support a finding that Arthur Treacher's was on the verge of bankruptcy, let alone that it was suffering irreparable injury from A&B's individual action.[12]
 
 
 55
 Not only does the record fail to sustain Arthur Treacher's irreparable injury argument, but the cases upon which Arthur Treacher's relies to support its assertion of irreparable harm, Semmes Motors, Inc. v. Ford Motor Co., 429 F.2d 1197 (2d Cir. 1970); Federal Leasing, Inc. v. Underwriters at Lloyd's, 650 F.2d 495 (4th Cir. 1981), are inapposite to the facts presented here. Those cases may not be relied upon for the principle that the threatened loss of a business due to delinquent receivables (royalties) justifies a preliminary injunction ordering the payment of the disputed monies. In Semmes Motors v. Ford Motor Co., no contested back payments were the subject of the injunction imposed. Rather, Ford was enjoined temporarily from terminating the 20-year-old automobile dealership operated by Semmes. In Federal Leasing, Inc. v. Underwriters at Lloyd's, the injunction issued by the court did not require Lloyd's to pay any specific disputed monies, but merely ordered that Lloyd's comply with the terms of the parties' insurance agreement by paying insurance claims after a good faith determination as to their validity.
 
 
 56
 In contrast to both the Semmes and Federal Leasing cases, the district court's order in the instant action requires A&B to pay specific, disputed back royalties which are at the heart of the controversy between the parties. Thus, the cases to which we have been referred by Arthur Treacher's do not change our view that claims for past due monies do not constitute irreparable injury. Thus, the district court's grant of a preliminary injunction for the payment of the disputed monies was unjustified.[13]
 
 C.
 
 57
 The second prerequisite for the granting of a preliminary injunction is a finding that the moving party has demonstrated a "reasonable probability of eventual success in the litigation." Kershner v. Mazurkiewicz, 670 F.2d 440 (3d Cir. 1982). The furthest we have gone in easing this standard is our statement that "where factors of irreparable harm, interests of third parties and public considerations strongly favor the moving party, an injunction might be appropriate 'even though plaintiffs did not demonstrate as strong a likelihood of ultimate success as would generally be required.' " Constructors Associations of Western Pennsylvania v. Kreps, 573 F.2d 811, 815 (3d Cir. 1978) (emphasis in original).[14] However, we have never gone so far as to depart from our established standard that a moving party must show a "reasonable probability of eventual success in the litigation." Nor have we ever abandoned the need for the district court to rule that the moving party has carried that burden.
 
 
 58
 Without more, it is evident that the failure by Arthur Treacher's to demonstrate, and the district court to hold, that Arthur Treacher's had shown a reasonable probability of eventual success is fatal to Arthur Treacher's application. Indeed, the district court purposely avoided ruling on this issue. It stated:
 
 
 59
 A discussion as to who will probably succeed on the merits has been purposely avoided. Both sides present viable claims the adjudication of which must await full dress trial.
 
 
 60
 (A. 456).
 
 
 61
 By its failure to comply with the established standard controlling the issuance of a preliminary injunction, the district court erred as a matter of law.
 
 D.
 
 62
 In its motion for preliminary relief, Arthur Treacher's did not ask that A&B be required to pay royalties, either past or current. Rather Arthur Treacher's simply requested an order that would effectively enforce its termination of A&B's franchise. The motion sought,
 
 
 63
 "a preliminary injunction ordering A&B Management Corporation (A&B) to immediately remove all Arthur Treacher's signs and other identifying characteristics from its stores, and any goods, materials, or products in its possession, custody or control; and restraining and enjoining A&B from infringing upon Arthur Treacher's Fish & Chips, Inc.'s trademarks in the future." (A. 16a).
 
 
 64
 Indeed, the issue confronting us would never have arisen had the district court limited its order to the relief actually sought by Arthur Treacher's. It was the substitution by the district court of a provision directing the payment of back royalties that has resulted in this appeal.
 
 
 65
 The difficulty here is not merely that the district court granted relief additional to, or different from, that sought by Arthur Treacher's. Our concern is that the dramatic difference in the relief sought by Arthur Treacher's-an injunction against trademark infringement-and that ordered sua sponte by the district court-payment of back royalties-left A&B with no opportunity to contest, either by offering evidence or argument, the appropriateness or validity of the requirements imposed by the injunction. Although we recognize that trial courts have broad discretion in determining whether to grant preliminary relief, see, e.g. A.L.K. Corp. v. Columbia Pictures Industries, Inc., 440 F.2d 761, 763 (3d Cir. 1971), the teachings of this court's decision in United States v. 47 Bottles, More or Less, 320 F.2d 564 (3d Cir.), cert. denied sub nom., Schere v. United States, 375 U.S. 953, 84 S.Ct. 444, 11 L.Ed.2d 313 (1963) and the Supreme Court's decision in Albemarle Paper Co. v. Moody, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975), lead us to conclude that apart from any other consideration, the district court improperly exercised its discretion when it ordered A&B to pay back royalties.
 
 
 66
 In United States v. 47 Bottles, More or Less, 320 F.2d 564 (3d Cir. 1963), the United States brought an action seeking condemnation of certain bottles of drugs because they had been misbranded in interstate commerce within the meaning of 21 U.S.C.A. § 352(a). After the issuance of the decree of condemnation, the manufacturer of the drugs moved for a stay of the entry of judgment. While that motion was pending the United States moved to amend its pleadings to include a prayer for injunctive relief against the manufacturer. After argument on the motions, the district court granted both the United States' motion to amend and the request for injunctive relief.
 
 
 67
 This court held that the trial court abused its discretion in granting the motion to amend at such a late stage in the proceedings. In doing so we stated:
 
 
 68
 we nonetheless think it unfair and substantially prejudicial to permit the injection of a new and different prayer for relief after trial at the very end of the case as was allowed here. But for the brief oral argument on the motion, Jenasol had no opportunity to raise and assert, through evidence or otherwise, equitable considerations by way of defense to an injunction or other possible mitigating factors.
 
 
 69
 320 F.2d 573-74.
 
 
 70
 Similarly, in Albemarle Paper Co. v. Moody, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975), the Supreme Court considered a Title VII job discrimination case in which the plaintiffs did not assert a request for back pay until after the trial on liability, five years subsequent to the filing of the complaint. The district court had denied the back pay request, but the Court of Appeals reversed. The Supreme Court vacated the judgment of the Court of Appeals, holding that, "(A) party may not be 'entitled' to relief if its conduct of the cause has improperly and substantially prejudiced the other party. The respondents here were not merely tardy, but inconsistent, in demanding back pay." 422 U.S. at 424, 95 S.Ct. at 2375.
 
 
 71
 The prejudice suffered by A&B is evident. Without notice that the payment of past royalties was involved in Arthur Treacher's motion for a preliminary injunction, A&B presented neither evidence nor argument on that issue. Indeed, the record reveals that prior to the July 30 order, A&B was never notified that the district court was contemplating a preliminary injunctive order which would require the payment of back royalties. Accordingly, the record is understandably silent with respect to the hardship that A&B might suffer as a result of a preliminary order compelling it to pay $200,000 to Arthur Treacher's, or with respect to argument in opposition to such an order. It was not surprising, therefore, that A&B's motion for reconsideration raised arguments similar to those advanced here and also addressed the issue of hardship.[15] We are thus satisfied, independent of the other reasons we have discussed for vacating the July 30 order, that, in ordering A&B to pay back royalties sua sponte and without notice, the district court did not properly exercise its discretion.
 
 IV.
 
 72
 The preliminary injunction from which A&B appeals did not respond to the relief which Arthur Treacher's had sought. Thus, the order which the district court entered in its well-motivated attempt to adjust the interests of all parties, failed to adhere to established principles of law.
 
 
 73
 We have concluded that neither the record developed in the district court, nor the legal precepts on which the district court and Arthur Treacher's relied, can support a preliminary award of disputed money damages. Inasmuch as the only effective provision of the district court's July 30, 1981 injunction, once A&B withdrew as a franchisee, required the payment of those monies prior in time to a final plenary trial, the injunction must be vacated.
 
 
 74
 We will vacate the July 30, 1981 order of the district court, 519 F.Supp. 739, and remand to the district court for further proceedings.[16]
 
 
 
 [1]
 The management of Orange Co. had advised Mrs. Paul's that an infusion of approximately $15 million over five years would be necessary to rejuvenate the Arthur Treacher's franchise system (A. 2204b-2205b). As a result of the known debilitated condition of the franchise system, Mrs. Paul's was able to acquire Arthur Treacher's $11 million of assets for the effective cost of $5 million (A. 467a)
 
 
 [2]
 Numerous actions arising out of the dispute between Arthur Treacher's and its franchisees are presently pending before this court and the District Court for the Eastern District of Pennsylvania. An order of the Judicial Panel on Multidistrict Litigation pursuant to 28 U.S.C. § 1407 assigned nine actions pending in five districts, to the Eastern District of Pennsylvania. Included were seven actions against franchisees and two actions against the franchisee's Association
 
 
 [3]
 A&B also moved for preliminary relief. A&B sought an order enjoining Arthur Treacher's and Mrs. Paul's from
 (1) continuing to violate the antitrust laws; (2) terminating A&B's franchise; (3) preventing distributors and suppliers from supplying A&B with products necessary to the operation of its franchise, or otherwise interfering with such supply; and (4) attempting to collect franchise fees from A&B (A. 63a).
 
 
 [4]
 The entire order of July 30 provides:
 AND NOW, this 30th day of July, 1981, in accordance with the Bench Ruling entered this date, it is hereby ORDERED that plaintiff's Motion for Preliminary Injunction is hereby GRANTED as follows:
 
 
 [1]
 Defendant, A&B Management Corporation shall, within twenty (20) days of the date of this Order, pay all past due royalties to plaintiff computed on the basis of four (4%) of defendant's monthly gross receipts. Defendant shall continue to pay royalties to plaintiff pending the litigation of this case
 
 
 [2]
 The grant of this preliminary mandatory injunction is conditioned upon the plaintiff taking no action to terminate defendant's franchise pending this litigation
 
 
 [3]
 The grant of this preliminary mandatory injunction is further conditioned upon plaintiff taking no action to prevent distributors and suppliers from supplying defendant with products necessary to the operation of its franchise, or otherwise interfering with such supply
 
 
 [4]
 This injunction will take effect upon the posting of a bond by plaintiff in the amount of One Hundred Thousand ($100,000) Dollars
 IT IS FURTHER ORDERED that defendant's Motion for Preliminary Injunction is DENIED.
 The court made it clear that it was also denying A&B's motion for preliminary relief, see note 3 supra (A. 481a n. 1).
 
 
 [5]
 In its memorandum denying A&B's motion for reconsideration, the district court made it clear that its July 30, 1981 order did not require A&B to continue as an Arthur Treacher's franchise. Nevertheless, the court stated that whether or not A&B remained in the Arthur Treacher's system, A&B would still be required to pay all allegedly past due royalties to Arthur Treacher's pendente lite (A. 518a-519a)
 
 
 [6]
 On October 28, 1981 Arthur Treacher's moved to dissolve this Court's Stay on the grounds that A&B, in failing to remove all identifying characteristics relating to Arthur Treacher's, had not complied with the stay order. On November 9, this Court ordered the district court to hold hearings and make appropriate findings and recommendations. After an evidentiary hearing, the district court found that A&B should take further steps to fully implement this Court's stay order, although it found that A&B had undertaken strenuous efforts to comply with the spirit of the stay order. The district court recommended that the motion to dissolve the stay be denied, but that Arthur Treacher's be awarded the reasonable costs and attorney's fees for presenting its motion. On December 23, this Court entered an order adopting the recommendations of the district court
 On March 4, 1982, Arthur Treacher's once again moved to dissolve this court's stay order, alleging that A&B had recently "admitted" it was still an Arthur Treacher's franchisee in an unrelated judicial proceeding in Pennsylvania State Court; that A&B uses a name that does not differentiate it from an Arthur Treacher's franchise-"Gulliver's Fish & Chips"; and that A&B continues to sell Arthur Treacher's unique products, including "batter-dipped triangular fish wedges and chips." As we conclude these contentions are devoid of merit, we deny Arthur Treacher's March 4, 1982 motion.
 
 
 [7]
 In its bench ruling on A&B's motion for reconsideration, the district court indicated that its preliminary injunctive order only required A&B to pay royalties as long as it continued as an Arthur Treacher's franchise (A. 518a-519a)
 
 
 [8]
 For the full text of the order of July 30, 1982, see note 4 supra
 
 
 [9]
 Arthur Treacher's has called our attention to a number of cases which it claims support its assertions that the district court's award of $200,000 here was not contrary to established equitable principles. For example, Arthur Treacher's has cited us two cases involving post-trial adjudications in favor of trademark owners, see, e.g., United States Jaycees v. Philadelphia Jaycees, 639 F.2d 134 (3d Cir. 1981); McAlpine v. AAMCO Automatic Transmissions, Inc., 461 F.Supp. 1232 (E.D.Mich.1978). These authorities are totally inapposite
 Also inapposite are cases in which courts granted preliminary relief conditioned upon the payment of money. See, e.g., United States v. Bedford Assocs., 618 F.2d 904 (2d Cir. 1980); Janmort Leas. Inc. v. Econo-Car Int'l., Inc., 475 F.Supp. 1282 (E.D.N.Y.1978). The order compelling A&B to pay $200,000 was not a condition precedent to any grant of equitable relief to A&B, see note 2 supra. Unlike the moving parties in Bedford and Janmort, A&B does not have the option of avoiding the payment of money by foregoing equitable relief granted by the court. The district court's July 30 order was absolute. Thus, neither Bedford nor Janmort support the contentions of Arthur Treacher's.
 Similarly, Arthur Treacher's reliance on Columbia Broadcasting System, Inc. v. American Society of Composers, Authors & Publishers, 320 F.Supp. 389 (S.D.N.Y.1970) is misplaced. There the court granted a preliminary injunction requiring CBS to pay for its current year's use of copyrighted music, conditioned on the grant of an interim copyright license to CBS. The preliminary injunction was only granted after CBS expressed its preference for such an order rather than the alternative relief requested by the plaintiff-an order enjoining CBS from infringing the music copyrights. 320 F.Supp. at 392 n. 6. In contrast, A&B has insisted that it would rather withdraw from the Arthur Treacher's system than pay the past due royalties (A. 501a-512a) and after this court's stay order of August 20, 1981, see at p. 1141, supra, A&B demonstrated that conviction by terminating its relationship with Arthur Treacher's.
 
 
 [10]
 It is evident from the district court's opinion that it was seeking an accommodation which would allow A&B to continue as an Arthur Treacher's franchisee, and at the same time would enable Arthur Treacher's to secure immediate cash monies-past and current royalties-which it claimed were necessary for its financial survival
 As we have pointed out, however, A&B terminated its franchise relationship with Arthur Treacher's and Arthur Treacher's need for royalties, which it characterized as the "lifeblood of the franchise system" (see p. 1141, supra ) cannot substitute for plenary proofs of liability and damages ascertainable only at final hearing. Nor, as we point out, can the concept of "royalties as lifeblood" satisfy the irreparable harm component essential to the issuance of a preliminary injunction.
 
 
 [11]
 While we believe that the principles discussed here with respect to just A&B might well preclude a showing of irreparable harm even if the other franchisees who have withheld royalties were parties to this action, which they are not, we need not decide that issue here
 
 
 [12]
 The testimony indicated that total unpaid royalties were $18 million. Significantly, Arthur Treacher's Statement of Operations for the period November 21, 1979 to June 30, 1980 indicates that royalties or license fees provide only 15.1% of Arthur Treacher's gross revenues, while sales of wholesale and retail foods provides 84.9%
 Additionally, the testimony of the accountant for Arthur Treacher's suggested that the financial drain must have been due to a source other than franchisee operations (A. 1684B-1703b).
 
 
 [13]
 A case presenting an analogous fact pattern is Dorfman v. Boozer, 414 F.2d 1168 (D.C.Cir.1969). There, tenants engaging in a rent strike over alleged housing code violations by their landlord were paying amounts equivalent to their rent into an account at a credit union. The landlord sought a preliminary injunction ordering the tenants' funds in the credit union to be paid into court for disbursement to the landlord. The district court granted the preliminary injunction
 On an appeal by the tenants, the landlord argued that the nearly bankrupt status of the partnership holding title to the apartments warranted the relief granted by the district court. This "verge of bankruptcy" argument was firmly rejected by the Court of Appeals for the District of Columbia:
 The other main justification for granting the preliminary injunction is appellees' claim that they are on the verge of bankruptcy. The argument is that, although there exist numerous legal avenues for proceeding, appellees' dire need for operating funds should allow a court of equity to take the funds of appellants before judgment and let them be used by appellees."
 Whether or not in any case the financial hardship of one party is sufficient ground for undercutting a comprehensive statutory scheme, the preliminary injunction here worked to alleviate the hardship of one party by exposing the other party to great financial risk; this is an unwarranted use of the extraordinary writ of preliminary injunction.
 414 F.2d at 1173. (footnotes omitted).
 
 
 [14]
 The district court cited Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d 738, 740 (2d Cir. 1953) in which the Second Circuit stated that if other considerations strongly favor the moving party, "it will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation." (footnotes omitted)
 The Hamilton Watch standard, however, has not been adopted by this court. Although the pertinent language was quoted in Railroad Yardmasters v. Pennsylvania R. Co., 224 F.2d 226, 229 (3d Cir. 1955), in that case the district court had concluded that the Yardmasters were likely to succeed on their Railway Labor Act claim. Apart from the isolated dictum in Railroad Yardmasters, no other cases have deviated from this court's consistent holding that moving parties must make some demonstration that they are likely to succeed on the merits to obtain a grant of preliminary relief.
 
 
 [15]
 The grounds stated by A&B in its motion for reconsideration are noted at pp. 1140-1141 supra. The district court denied A&B's motion for reconsideration without an evidentiary hearing
 
 
 [16]
 We also dismiss Arthur Treacher's cross-appeal at 81-2562. The cross appeal was filed in an effort to have us review and reject one sentence which appears at p. 749 of the district court's opinion. The sentence reads:
 This is not to say that (A&B's) position and its case has not raised similarly substantial questions going to the merits of this case. (A. 486a).
 Particular objection was taken by Arthur Treacher's to the words "substantial questions." Thus, it filed a cross-appeal.
 We refrain from commenting on the merit of an appeal taken from a mere observation which is found in the district court's opinion. Rather we dismiss Arthur Treacher's appeal on the established principle and authority that "(a) party successful in the district court has no right of appeal from a judgment in its favor, for the purpose of obtaining a review of findings he deems erroneous which are not necessary to support the decree." Electrical Fittings Corp. v. Thomas & Betts Co., 307 U.S. 241, 242, 59 S.Ct. 860, 83 L.Ed. 1263 (1939).